UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MD ANAM ULLAH,

            Petitioner,

                                              Civil Action No. 10-CV-11495
v.                                            HON. BERNARD A. FRIEDMAN

HUGH WOLFENBARGER,

            Respondent.

_____/

## OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION, DENYING A CERTIFICATE OF APPEALABILITY AND GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Petitioner Md Anam Ullah has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The pleading challenges petitioner's conviction and sentence of fifteen to thirty-five years for second-degree murder.  Respondent urges the court to deny the petition on grounds that petitioner's claims either lack merit or are procedurally defaulted.  The Court finds that petitioner's claims do not warrant habeas relief.  Accordingly, the habeas petition will be denied on the merits.

## I.  Background

### A.  The Trial and Direct Appeal

Petitioner was charged in Wayne County, Michigan with first-degree murder.  The charge arose from allegations that petitioner stabbed and strangled his wife, Farzana Chowdhury, at their apartment in Detroit on July 8, 2002.  The prosecutor's theory was that the homicide was a premeditated and deliberated murder, which arose from Farzana's extramarital affair with a neighbor, Mohammed Kamal.  The testimony at trial has been summarized by the state court as

follows:

> Dr. [Leigh] Hlavaty of the Wayne County Medical Examiner's Office testified [that] Farzana was stabbed five times:
>
> > a.  One time on the right side of the neck;
> > b.  One time on the right breast;
> > c.  Three times on the right side of the abdomen.
>
> There were also eight other cuts or incised wounds on the forearm, and palm of the left hand, described by the coroner as "defensive wounds."  Farzana also had several small bruises with pinpoint hemorrhages; semi-circular abrasions on her cheek; lacerations to the inside of her mouth (caused by teeth); and a linear bruise beneath her left eye.  The circular abrasions on her cheek were consistent with fingernail marks, that is, consistent with a hand being held over her mouth with sufficient force to cause tears on the inside of her mouth by the victim's own teeth.
>
> Dr. Hlavaty opined [that] the cause of death was multiple stab wounds and manual strangulation.  She opined [that] it takes between two to three minutes for a person to die from manual strangulation The strangulation in this case occurred after Farzana was stabbed.
>
> Ziaur Chowdhury was the brother of Farzana Chowdhury.  He lived in the same apartment building as Ullah and Farzana for about four months before the murder.  Ullah and Farzana had two children. Ullah and Farzana did not get along.  Ziaur knew Farzana was having an extramarital affair with Mohammed Kamal, who also lived in the same apartment building.  Farzana told her brother she wanted to divorce Ullah.
>
> Kamal spoke with both Farzana and Ullah between 12:00 and 1:00 in the morning of July 8, and he could hear Ullah in the background.  Ullah was very angry.  About fifteen minutes later Ullah called Kamal and asked him why he was having an affair with his wife.  Kamal told him to come to his apartment to speak with him "face to face" and hung up the phone.  Ullah did not come that night.
>
> Ullah came to Kamal's apartment the next morning between 6:00 and 7:00 a.m.  He was crying.  Ullah told Kamal he "found his wife dead."
>
> Kamal's roommate was Mohammed Hossain.  Hossain lived

across the hall from Ullah and Farzana.  Hossain was aware of the adulterous relationship between Kamal and Farzana.  Hossain went to Farzana's apartment that morning and saw her lying on the bedroom floor.

Mohammed Morshed [sic] testified that Ullah came to his apartment between 6:30 and 7:00 in the morning and told him his wife was dead.

Mohammed Hossain and Golam Ahmed went to Farzana's apartment.  Golam called 911 and gave the phone to Ullah.  Ullah spoke to the operator and said, "I killed my wife."  Then he said, "I killed her she's dead."  Then, Ullah said she "committed suicide."

Police Officer John Chaisson responded to the scene and observed the bleeding body of Faranza [sic].  He did not note any observations consistent with suicide.

Police Officer Ralph Smith noted blood in several places, on the mattress where the victim lay, in the bath tub, and in another bedroom.  There was a knife on the kitchen counter and one in an overhead cabinet.  He also found a pair of men's shorts with suspected blood on them.

Detroit Police Officer Michael Carlysle [sic] read Mr. Ullah his Miranda rights.  He testified [that] Ullah spoke to him voluntarily. Ullah told Carlysle [sic] that he and his wife had been arguing for several months over Farzana's relationship with Kamal.  Ullah asked his wife to stop the affair for the children.  Sometimes Farzana would tell the children Ullah was not their father.  They argued and Farzana slapped Ullah on the side of his head.  Ullah got a knife and stabbed her, but could not recall the number of times.  He then attended to the children, who were present in the apartment at the time of the stabbing.  He changed his pants and then went to his neighbor's apartment. Ullah then called the police.

Opinion and Order Denying Defendant's Motion for Relief from Judgment, No. 02-009456-01, at

3-5 (Wayne County Cir. Ct. Jan. 22, 2009).[1]

---

[1]  The court believes that the testimony attributed to Mohammed Morshed was actually Lien Choudhury's testimony.  Mohammed Morshed did not testify at trial.

Petitioner did not testify or present any witnesses at his trial, and he did not deny killing his wife. His defense was that he was guilty of voluntary manslaughter, not murder. The trial court instructed the jury on first-degree murder, second-degree murder and voluntary manslaughter. On November 13, 2002, the jury found petitioner guilty of second-degree murder. MICH. COMP. LAWS 750.317. The trial court sentenced petitioner to a prison term of fifteen to thirty-five years. Petitioner argued in a delayed application for leave to appeal that: (1) his motion for a directed verdict of acquittal was improperly denied and his conviction for second-degree murder was based on insufficient evidence; (2) the sentencing guidelines were erroneously scored and the trial court did not provide a substantial and compelling reason for departing from the guidelines; (3) his trial attorney was ineffective at sentencing and (4) the trial court penalized him for exercising his right to go to trial. The Michigan Court of Appeals denied petitioner's application "for lack of merit in the grounds presented." *See People v. Ullah*, No. 251734 (Mich. Ct. App. Mar. 12, 2004). On September 28, 2004, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Ullah*, 471 Mich. 885 (2004) (table).

**B. The Motion for Relief from Judgment and Subsequent Appeal**

Petitioner subsequently filed a motion for relief from judgment, claiming that: (1) he did not understand his *Miranda* rights because he does not speak English; (2) he was deprived of his rights under the Vienna Convention on Consular Relations (the Vienna Convention); (3) the trial court erroneously cited his lack of remorse or acceptance of responsibility at sentencing and (4) his trial and appellate attorneys were ineffective. The trial court rejected claims one and two on the ground that petitioner could have raised those claims on appeal. The trial court determined that it was precluded from granting relief on claims three and four because petitioner raised those claims

4

on direct appeal.   Although petitioner appealed the trial court's decision, the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).   *See People v. Ullah*, No. 292434 (Mich. Ct. App. Oct. 13, 2009); *People v. Ullah*, 485 Mich. 1127 (2010) (table).

### C.  The Habeas Petition and Responsive Pleading

Petitioner filed his habeas corpus petition on April 14, 2010.  His grounds for relief are: (1) he was denied due process of law by the trial court's denial of his motion for a directed verdict of acquittal on the charge of first-degree murder and his conviction for second-degree murder is based on insufficient evidence; (2) the sentencing guidelines were improperly scored and the trial court did not provide a substantial and compelling reason for departing from the guidelines; (3) his trial attorney was ineffective at sentencing; (4) the trial court penalized him for exercising his right to go to trial; (5) trial counsel was ineffective for failing to challenge the admission of petitioner's statement to the police on the basis that the investigating officer fabricated the statement; (6) the prosecutor was obligated to correct the investigating officer's false testimony; (7) appellate counsel was ineffective for not raising these claims on appeal; (8) appellate counsel was "cause" for petitioner's failure to raise all his claims on appeal; (9) petitioner's statement to the police was involuntary and should have been suppressed because the *Miranda* warnings were read to him in a language that he did not understand; (10) no one advised him of his rights under the Vienna Convention; (11) at sentencing, the trial court relied on petitioner's lack of acceptance of responsibility and (12) trial counsel was ineffective for failing to object to the errors.

Respondent argues that claims five and six are procedurally defaulted because petitioner failed to exhaust state remedies for those claims while there was an available state remedy

5

to exhaust.  Respondent maintains that claims seven through twelve are procedurally defaulted because petitioner failed to raise those claims on direct appeal and the state courts rejected the claims on that basis.  Petitioner replies that he exhausted state remedies for all his claims, that none of his claims are procedurally defaulted and that counsel's ineffectiveness is "cause" for any procedural error.  The Court elects to excuse the alleged defaults because "exhaustion and procedural default are not jurisdictional limitations," *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 3274 (2010), and petitioner's claims lack substantive merit.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, state prisoners are entitled to a writ of habeas corpus only if the state court's adjudication of their claims on the merits

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).[2]

---

[2]  The Court finds it unnecessary to decide whether the state courts adjudicated each of petitioner's claims "on the merits" within the meaning of § 2254(d), because the Court would reach the same result whether the court deferred to the state court's decision or reviewed the issue *de novo*.  *Cotto v. Herbert*, 331 F.3d 217, 252-253 (2d Cir. 2003).  In this Circuit, moreover, even independent review of the record "is not a full, de novo review of the claims,"

> Under the "contrary to" clause, a federal habeas court may grant the
> writ if the state court arrives at a conclusion opposite to that reached
> by [the Supreme] Court on a question of law or if the state court
> decides a case differently than [the Supreme] Court has on a set of
> materially indistinguishable facts.   Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if the
> state court identifies the correct governing legal principle from [the
> Supreme] Court's decisions but unreasonably applies that principle
> to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his claim "was so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-787.

## III.  Discussion

### A.  Denial of the Motion for Directed Verdict and Sufficiency of the Evidence (Habeas Claim One)

Petitioner alleges that the trial court violated his right to due process when it denied his motion for a directed verdict of acquittal on the charge of first-degree murder.  He further alleges that there was insufficient evidence adduced at trial to support his conviction for second-degree murder.  He maintains that the evidence was consistent with the charge of voluntary manslaughter, not murder.

---

but "remains deferential, because the court cannot grant relief unless the state court's result contradicts the strictures of AEDPA."  *Howard v. Bouchard*, 405 F.3d 459, 467-468 (6th Cir. 2005) (citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

### 1.  **Legal Framework**

Under Michigan law, a judge "ruling on a motion for a directed verdict of acquittal must consider the evidence presented by the prosecution up to the time the motion is made, view that evidence in a light most favorable to the prosecution, and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v. Hampton*, 407 Mich. 354, 368 (1979) (internal and end citations omitted). The same standard applies to sufficiency of the evidence claims on habeas corpus review.  The relevant question  "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  *Jackson* claims are subject to two layers of judicial deference in federal habeas corpus proceedings:  deference to the jury's verdict and deference to the state court's decision.  *Coleman v. Johnson*, __ U.S. __, __, 132 S. Ct. 2060, 2062 (2012) (*per curiam*); *Nali v. Phillips*, 681 F.3d 837, 841 (6th Cir. 2012).

Courts must apply the *Jackson* standard "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324, n.16.  In Michigan, the elements of premeditated murder are (1) the defendant killed the victim and (2) the killing was "willful, deliberate, and premeditated." *People v. Bowman*, 254 Mich. App. 142, 151 (2002) (quoting Mich. Comp. Laws § 750.316(1)(a)).  "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Morrin*, 31 Mich. App. 301, 329 (1971) (internal and end footnotes omitted).  "While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the

8

nature of his response to a 'second look.'" *Id*. at 330. "A pause between the initial homicidal intent and the ultimate act may, in the appropriate circumstances, be sufficient for premeditation and deliberation." *People v. Plummer*, 229 Mich. App. 293, 301 (1998) (citing *People v. Tilley*, 405 Mich. 38, 45 (1979)).

The elements of second-degree murder are "(1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v. Smith*, 478 Mich. 64, 70 (2007) (citing *People v. Goecke*, 457 Mich. 442, 464 (1998)). Malice, for purposes of second-degree murder, is "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Goecke*, 457 Mich. at 464 (citing *People v. Aaron*, 409 Mich. 672, 728 (1980)).

Voluntary manslaughter is an intentional killing, but it applies only when the killing was "committed under the influence of passion or in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool and reason to resume its habitual control . . . ." *People v. Mendoza*, 468 Mich. 527, 535 (2003) (quoting *Maher v. People,* 10 Mich. 212, 219 (1862)). It is "the result of the temporary excitement, by which the control of reason was disturbed, rather than of any wickedness of heart or cruelty or recklessness of disposition." *Id*. (quoting *Maher*, 10 Mich. at 219).

## 2. Application

Petitioner conceded at trial that he was responsible for his wife's death. He argued in his motion for a directed verdict of acquittal that the prosecution failed to prove the elements of

9

premeditation and deliberation. He maintained that he and his wife argued, that the argument escalated into violence, and that the killing was manslaughter because it was done in the heat of passion due to his wife's affair with another man. The trial court denied petitioner's motion because, in its opinion, a rational trier of fact could find guilt beyond a reasonable doubt based on the medical examiner's testimony, the testimony of other witnesses and petitioner's admissions to his neighbors. (Tr. Nov. 13, 2002, at 177-188.)

Premeditation and deliberation may be inferred from the circumstances of the killing and may be established through evidence of, "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich. App. 158, 170 (1992) (citing *People v. Johnson*, 93 Mich. App. 667, 675 (1979); *People v. Gonzalez*, 178 Mich. App. 526, 533 (1989)). Petitioner admits that he and his wife had a prior acrimonious relationship, and in his statement to the police, he claimed that he felt hurt and depressed when his wife told their children that he was not their father. Petitioner's acrimonious relationship with Farzana supports a finding of premeditation and deliberation.

Petitioner's actions before the killing also support the conclusion that he premeditated and deliberated the killing. He was shouting, and he sounded angry when Farzana spoke to Mohammed Kamal by telephone on the night of the killing. Shortly after Farzana's call to Kamal, petitioner called Kamal and demanded to know why Kamal was having an affair with his wife.

The circumstances of the killing indicate that petitioner and Farzana were having an argument when Farzana slapped petitioner on the side of his head. Petitioner then went to the kitchen, acquired a knife, walked to another room where Farzana was sitting on a mattress, and

10

stabbed her five times.  There was evidence of defensive wounds, which the medical examiner said was an indication of a struggle over a sharp object.  Even if the repeated stabbing were not enough to establish premeditation and deliberation, there was evidence that Farzana was still alive when she was strangled and that it takes about two and a half minutes to kill a person by manual strangulation. "Manual strangulation can be used as evidence that a defendant had an opportunity to take a 'second look.'" *People v. Gonzalez*, 468 Mich. 636, 641 (2003).

Petitioner's conduct after the killing also support a finding of premeditation and deliberation.  According to his statement to the police, he was awake most of the night after the killing and did not call the police or inform his neighbors of his wife's death until morning.

Petitioner contends there was no evidence of planning or a preconceived design and that the evidence suggests he was frenzied, distraught, and disoriented.  But according to his own confession, he walked to the kitchen to acquire a knife following the altercation with his wife.  He then walked to another room where his wife was seated and stabbed her several times.  The victim's defensive wounds were an indication that the stabbing took some time and effort, and the subsequent strangulation would have required additional time and effort.

A rational juror could have concluded from the evidence taken in a light most favorable to the prosecution that petitioner had enough time to take a "second look" at what he was doing.  Thus, the evidence was sufficient to establish the elements of premeditation and deliberation, and the trial court's denial of petitioner's motion for a directed verdict of acquittal did not deprive petitioner of due process.

The elements of premeditation and deliberation distinguish first-degree murder from second-degree murder.  *People v. Dykhouse*, 418 Mich. 488, 516 (1984).  Because there was

11

sufficient evidence to support the first-degree murder charge, there was also sufficient evidence to support petitioner's conviction for the lesser-included offense of second-degree murder. Although petitioner contends that he acted in the heat of passion, such that the crime should have been voluntary manslaughter, there was inadequate provocation on the victim's part. Her affair with another man was known to petitioner before the day of the killing, and, as the trial court recognized, the trauma caused by Farzana's extramarital affair did not justify taking her life, no matter how much distress petitioner may have experienced.

A rational trier of fact could have concluded from the evidence that petitioner caused his wife's death, that he acted with malice and that his conduct was not justified by adequate or reasonable provocation. Thus, there was sufficient evidence of second-degree murder and petitioner has no right to habeas corpus relief on the basis of his challenge to the sufficiency of the evidence.

**B. Petitioner's Statement to the Police** (Habeas Claims Five, Six, and Nine)

Petitioner alleges that his statement to Detroit Police Officer Michael Carlisle was involuntary and should have been suppressed because his constitutional rights were read to him in English, a language that he did not understand. Petitioner further alleges that Officer Carlisle fabricated the custodial statement and that trial counsel was ineffective for failing to challenge admission of the statement in evidence

### 1. Clearly Established Federal Law

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that,

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence

12

against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Id*. at 444.

Because petitioner alleges that his waiver of the *Miranda* rights was involuntary, the issue is whether the waiver was "a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  "[L]anguage difficulties may impair the ability of a person in custody to waive [*Miranda*] rights in a free and aware manner."  *United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir. 1985) (citing *United States v. Gonzales*, 749 F.2d 1329, 1335–1336 (9th Cir. 1984); *United States v. Martinez*, 588 F.2d 1227, 1235 (9th Cir.1978)).

### 2. Application

The record in this case establishes that petitioner came to this country from Bangladesh about four months before he killed his wife.  Although a Bengali-speaking interpreter was used at trial, petitioner's brother-in-law, Ziaur Chowdhury, testified that he had spoken English with petitioner (Tr. Nov. 13, 2002, at 30), and Mohammed Kamal testified that he once heard petitioner speak English (*Id*. at 44-45).  Golam Ahmed testified that petitioner tried to speak to the 911 operator in English after the killing, but that petitioner's English was not clear.  (*Id*. at 94-95.)

Officer Michael Carlisle interviewed petitioner following his arrest and testified at trial that he had been able to talk to petitioner in English and that petitioner understood him.  Officer Carlisle reviewed petitioner's constitutional rights with him and instructed him to place his initials

13

by each right if he understood them.  Petitioner initialed his rights and answered Officer Carlisle's

questions.  At the conclusion of the statement, Officer Carlisle asked petitioner to initial each answer

which Carlisle had written down if the answer was correct and to sign each page if he was satisfied

with the contents of the page.  Petitioner initialed each answer and signed both pages of the statement.

At times, Officer Carlisle had to ask petitioner to repeat an answer due to his heavy accent, but

Carlisle thought that petitioner voluntarily and intelligently waived his *Miranda* rights.  (*Id*. at 145-

55.)

             The  record  contradicts  petitioner's  allegation  that  his  waiver  of  rights   was

involuntary.  Although he may not have been fluent in English, he apparently understood and could

communicate in the language.

             The  record  also  does  not  establish  that  Officer  Carlisle  fabricated  petitioner's

statement.  The statement was consistent with the other evidence, and even though Officer Carlisle

admitted that he had read some witness statements before interviewing petitioner, he did not speak

with any other witnesses.  Furthermore, petitioner was the only person to admit being present during

the stabbing, and Officer Carlisle was familiar with what happened because he responded to the crime

scene. (*Id*. at 155-57.)

             There was, thus, no basis to suppress the statement.  Consequently, trial counsel was

not ineffective for failing to object to admission of petitioner's statement into evidence.  The Court

therefore declines to grant relief on the basis of petitioner's fifth, sixth, and ninth claims regarding

his statement to the police, the investigating officer's testimony and counsel's failure to object to the

admission of his statement.

     **C.  The Vienna Convention** (Habeas Claim Ten)

Petitioner alleges that he had a right under the Vienna Convention to contact his native country's consulate upon his arrest.  He claims that the trial court, prosecutor and defense counsel failed to advise him of that right and thereby deprived him of his right to due process of law under the state and federal constitutions.

In 1969, the United States ratified the Vienna Convention.  *Medellin v. Texas*, 552 U.S. 491, 499 (2008).  Article 36 of the Vienna Convention "provides that if a person detained by a foreign country 'so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State' of such detention, and 'inform the [detainee] of his righ[t]' to request assistance from the consul of his own state."  *Id.* (alterations in original).

The Supreme Court has assumed, without deciding, that Article 36 of the Vienna Convention grants foreign nationals an individually enforceable right to be informed by authorities of the availability of consular notification.  *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 342-343 (2006); *Medellin*, 552 U.S. at 506  n.4.  To date, the Supreme Court "has never addressed directly whether Article 36 of the Vienna Convention grants to individuals judicially enforceable rights." *Loza v. Mitchell*, 705 F. Supp.2d 773, 802-803 (S.D. Ohio 2010).  And, in a pre-*Medellin* decision, the Sixth Circuit held that the Vienna Convention does not create a judicially enforceable right for a detained foreign national to consult with the diplomatic representatives of his nation.  *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001).  "A contrary conclusion risks aggrandizing the power of the judiciary and interfering in the nation's foreign affairs, the conduct of which the Constitution reserves for the political branches."  *Id.*  Petitioner therefore has no right to relief on the basis of his claim that his attorney and state officials failed to advise him of his right to contact his country's consulate.  *Loza*, 705 F. Supp.2d at 802-803.

15

Even if petitioner had a judicially enforceable right to the protections afforded foreign nationals under Article 36, he has not alleged how he was prejudiced by the violation of his rights. "[I]t is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." *Breard v. Greene*, 523 U.S. 371, 377 (1998) (citing *Arizona v. Fulminante*, 499 U.S. 279 (1991)). Furthermore, to the extent petitioner maintains that his statement to the police should have been suppressed as the result of an Article 36 violation, his claim is foreclosed by *Sanchez-Llamas* wherein the Supreme Court held that the suppression of a defendant's statements to the police does not appropriately remedy a violation of Article 36 of the Vienna Convention. *Sanchez-Llamas*, 548 U.S. at 337, 349-350.

**D. The Sentence** (Habeas Claims Two, Four, and Eleven)

**1. The Sentencing Guidelines**

Petitioner challenges his sentence on the grounds that the trial court incorrectly scored the Michigan sentencing guidelines and improperly departed from the guidelines. Petitioner's argument that the trial court misapplied the sentencing guidelines "raises an issue of state law only. It does not implicate any federal rights." *Garcia-Dorantes v. Warren*, 769 F. Supp.2d 1092, 1112 (E.D. Mich. 2011). And "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Therefore, petitioner's claim with respect to the sentencing guidelines is not cognizable on federal habeas corpus review.

**2. Exercising the Right to go to Trial and Accepting Responsibility**

More troubling is petitioner's allegation that the trial court penalized him for exercising his right to go to trial and for not accepting responsibility for his conduct. Petitioner contends that he might have received a more lenient sentence if he had pleaded guilty or

16

acknowledged his guilt at sentencing.

"'[A] court may not use the sentencing process to punish a defendant . . . for exercising his right to receive a full and fair trial.'" *United States v. Evers*, 669 F.3d 645, 661 (6th Cir. 2012) (quoting *United States v. Wilcox*, 487 F.3d 1163, 1176 (8th Cir. 2007) (internal quotations omitted). But courts may extend leniency in exchange for a guilty plea and decline to extend leniency to those who have not demonstrated the attributes on which leniency is based. *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978). "A plea of guilty is an indication of contrition, so it is not surprising that 'leniency is more often granted to defendants who accept responsibility by pleading guilty.'" *United States v. Phibbs*, 999 F.2d 1053, 1080 (6th Cir. 1993) (quoting *United States v. Saunders*, 973 F.2d 1354, 1362 (7th Cir. 1992)).

Petitioner was charged with first-degree murder, but before trial, the prosecutor offered to reduce the charge to second-degree murder if petitioner pleaded guilty to that offense. The prosecutor also agreed to a tentative minimum sentence at the low end of the sentencing guidelines range, which was estimated to be twelve years in prison (Tr. Nov. 13, 2002, at 5-6). Petitioner rejected the plea offer and, following trial, was found guilty of second-degree murder and sentenced to a minimum sentence of fifteen years in prison.

Before sentencing petitioner, the trial court noted that petitioner had a chance to plead guilty on the morning of trial and had rejected the offer. Petitioner interprets the trial court's remarks to mean that he would have received a more lenient sentence if he had pleaded guilty or admitted guilt.

The trial court's disputed remarks occurred when trial counsel asked the court to consider a sentence at the low end of the guidelines or even below the guidelines. The trial court

17

responded:

>How am I going to go below the guidelines?  He had a chance
>to do that when he could have taken responsibility for his actions.  He
>had the chance to plea[d] on the morning of trial[.]  [The prosecutor],
>if I understand it right, was offering him a sentence of nine years.  Is
>that wrong?  I might be confusing it with another case.
>
>What did you offer him?
>
>[THE PROSECUTOR]: We hadn't figured out the guidelines,
>but the bottom end of the guidelines could have indicated anywhere
>preliminarily between 9 and 12 years on the bottom.
>
>THE COURT:  That's what I'm saying, he could have done
>that then.   He could have taken nine years and said I accept
>responsibility, give me nine years and I'll take the nine years.  That's
>what I understood was being communicated.  And as so often is the
>case, what everybody wants to do is gamble, throw the dice, hope that
>they get a better result, and then if they don't say, hey give me the
>nine anyway now that I've exhausted everything. And I'm saying, I'm
>not – it doesn't mean they're not remorseful, but it shows to some
>extent a lack of accepting responsibility for the actions.  You see.
>They want to exhaust all their avenues.  They want to exhaust all their
>possibilities and then say, well, hey, Judge, do it any ways, even
>though – it just doesn't strike me as an acceptance of the
>responsibility.  See that's the problem that I have as opposed to a plea
>where you accept responsibility.  And sometimes because of the fact
>that we're a large population things become impersonal and that's
>what happens.  And they forget to accept responsibility and they want
>to roll the dice.  So that's what he did.  I can't then just do whatever
>comes into my head.  That would be arbitrary, you see.  So I'm kind
>of stuck.
>
>. . . .
>
>[DEFENSE COUNSEL]: Your Honor, I can't disagree with
>that.  My only statement was that if you felt it was appropriate, you –
>I'd ask that you go below.  And you're saying no, and I don't disagree.
>
>THE COURT: Well I just don't – I mean, you know, whatever
>the guideline is that's where I'm at.   What's the objective and
>compelling circumstance that would case me to go below?

[DEFENSE COUNSEL]: I can't say.  That's not – it's
– the fact that –

THE COURT: Well if there is any, I would certainly think about it.

(Tr.  Nov. 27, 2002, at 6-8.)  The court subsequently stated that, because petitioner had rejected the offer to plead guilty, it was required to use the sentencing guidelines and could consider the failure to accept responsibility because a trial requires witnesses to testify and to relive the trauma.  (*Id.* at 16-17, 26.)

The trial court did not compel petitioner to admit guilt or to accept responsibility. Taken in context, it is clear that the trial court was explaining why it was not obligated to impose the same sentence that was offered to petitioner during plea negotiations and why the court chose not to depart downward from the sentencing guidelines.  The court was acknowledging its right not to extend leniency to petitioner following his rejection of the plea offer.

When subsequently imposing the sentence, the trial court focused on petitioner's actions on the night of the crime, stating that petitioner's conduct was deliberate, unjustified, and unquestionably harmful to his children.  The court gave the following reasons for its sentence:  to punish petitioner for his actions; to deter others from engaging in his type of behavior; to protect society; and to rehabilitate petitioner.  (Tr. Nov. 27, 2002, at 27-28.)

The fact that petitioner received a more severe sentence upon conviction does not establish judicial vindictiveness.  *United States v. Townsend*, 796 F.2d 158, 164 (6th Cir. 1986). Having rejected the plea bargain, petitioner "cannot expect to receive the benefits of that bargain after conviction."  *Id.* (citing *United States v. Lippert*, 740 F.2d 457, 460 (6th Cir. 1984)).  The Court therefore declines to grant habeas corpus relief on the basis of petitioner's fourth and eleventh claims.

**E.  Trial Counsel** (Habeas Claims Three and Twelve)

19

Petitioner alleges that his trial attorney was ineffective for failing to object to the errors cited above and, in particular, for not objecting to the scoring of three offense variables at sentencing.

### 1. Clearly Established Federal Law

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), is clearly established federal law for purposes of evaluating an ineffective assistance of counsel claim. *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1403 (2011). Under *Strickland*, an attorney is constitutionally ineffective if "counsel's performance was deficient" and "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

To establish deficient performance, a habeas petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. To demonstrate that counsel's performance prejudiced the defense, a habeas petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id*. at 788 (internal and end citations omitted).

### 2. Application

#### a. Offense Variable Five

Petitioner received fifteen points for offense variable five of the sentencing guidelines (psychological injury to a member of the victim's family). *See* MICH. COMP. LAWS § 777.35.

Fifteen points is appropriate if "[s]erious psychological injury requiring professional treatment occurred to a victim's family." MICH. COMP. LAWS § 777.35(1)(a). "In making this determination, the fact that treatment has not been sought is not conclusive." MICH. COMP. LAWS § 777.35(2).

Zero points is appropriate for offense variable five if "[n]o serious psychological injury requiring professional treatment occurred to a victim's family." MICH. COMP. LAWS § 777.35(1)(b). Petitioner contends that he should not have received any points because there was no evidence that the victim's family suffered serious psychological injury requiring professional treatment.

No one from the victim's family spoke at sentencing, but the trial court received a three-page letter from the victim's brother, Ziaur Chowdhury. (Tr. Nov. 27, 2002, at 14, 24.) Although the letter was not read into the record, the trial court inferred from the letter that the victim's children knew about the crime even if they did not observe it. The trial court opined that, as a result of the incident, the children would be affected for the rest of their lives. (*Id.* at 24.) The court went on to say that, "because of the defendant's rage he not only perpetuated the trauma, he exacerbated it, not only to himself but to each and every member of his family and [that's] something that they will have for the rest of their life [sic]." (*Id.*)

Given the trial court's comments, it is unlikely that the trial court would have reduced the score for offense variable five from fifteen to zero. Petitioner's attorney was not constitutionally ineffective for failing to make a futile objection to the sentencing guidelines. *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

### b.  Offense Variable Six

Petitioner also challenges the fifty points that he received for offense variable six,

21

which calculates the offender's intent to kill or injure another individual.  *See* MICH. COMP. LAWS § 777.36.  This offense variable should be scored at fifty points if "[t]he offender had premeditated intent to kill" or the killing was committed while committing or attempting certain crimes enumerated in the statute.  MICH. COMP. LAWS § 777.36(1)(a).

Twenty-five points is appropriate if "[t]he offender had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result."  MICH. COMP. LAWS § 777.36(1)(b).  Ten points is appropriate if "[t]he offender had intent to injure or the killing was committed in an extreme emotional state caused by an adequate provocation and before a reasonable amount of time elapsed for the offender to calm or there was gross negligence amounting to an unreasonable disregard for life."  MICH. COMP. LAWS § 777.36(1)(c).  No points should be scored if there was no intent to kill.  MICH. COMP. LAWS § 777.36(1)(d).  Furthermore,

> [a]ll of the following apply to scoring offense variable 6.
>
> (a) The sentencing judge shall score this variable consistent with a jury verdict unless the judge has information that was not presented to the jury.
>
> (b) Score 10 points if a killing is intentional within the definition of second degree murder or voluntary manslaughter, but the death occurred in a combative situation or in response to victimization of the offender by the decedent.

MICH. COMP. LAWS § 777.36(2).

Petitioner was convicted of second-degree murder, not first-degree premeditated murder, and the trial court agreed that it was not a case of premeditated murder.  (Tr. Nov. 27, 2002, at 15-16.)  Therefore, the score of fifty points was inconsistent with the jury's verdict and improper

22

under MICH. COMP. LAWS § 777.36(2)(a).

Petitioner argues in favor of ten points.  As noted, under MICH. COMP. LAWS § 777.36(2)(b), a trial court must score offense variable six at ten points "if a killing is intentional within the definition of second degree murder or voluntary manslaughter, but the death occurred in a combative situation or in response to victimization of the offender by the decedent." Petitioner was convicted of second-degree murder, but he was not victimized by the decedent.  The question therefore is whether "the death occurred in a combative situation."  The statute does not define "combative situation," but, in another case, the Michigan Court of Appeals used the dictionary definition of "combative" as "ready or inclined to fight; pugnacious." *See People v. Rodriguez*, 212 Mich. App. 351, 353 (1995).

Petitioner informed the police that his wife slapped him on the side of his face prior to the stabbing.  Whether a slap on the side of the face rises to the level of a combative situation is questionable, and, other than the slap, there is no evidence that Farzana was inclined to fight with petitioner.  Consequently, there is not a reasonable probability that trial counsel would have prevailed if he had argued in favor of ten points for offense variable six.

A score of twenty-five points for offense variable six would have been consistent with the jury's verdict of second-degree murder, which requires "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Goecke*, 457 Mich. at 464. And, according to respondent, the sentencing guidelines would not have changed if petitioner's score for offense variable six had been reduced from fifty points to twenty-five points.  Therefore, trial counsel's failure to object to the improper scoring of offense variable six did not prejudice petitioner.

23

### c. Offense Variable Ten

Offense variable ten is used to calculate exploitation of a vulnerable victim. MICH. COMP. LAWS § 777.40. Predatory conduct warrants a score of fifteen points. MICH. COMP. LAWS § 777.40(1)(a). Ten points is appropriate if the offender exploited a victim's physical or mental disability, youth or agedness, or a domestic relationship, or if the offender abused his or her authority status. MICH. COMP. LAWS § 777.40(1)(b). Five points is proper if "[t]he offender exploited a victim by his or her difference in size or strength, or both, or exploited a victim who was intoxicated, under the influence of drugs, asleep, or unconscious." MICH. COMP. LAWS § 777.40(1)(c). Of course, the score should be zero if "[t]he offender did not exploit a victim's vulnerability." MICH. COMP. LAWS § 777.40(1)(d).

Petitioner received ten points for offense variable ten. He asserts that he should have received no points, or, at most, five points, but it could be argued that he exploited a domestic relationship and, therefore, ten points was a proper score. Furthermore, even if he had received no points for offense variable ten and only twenty-five points for offense variable six, the sentencing guidelines range would not have changed, according to respondent. Petitioner does not dispute this fact. Thus, even assuming that trial counsel's performance was deficient, petitioner was not prejudiced by counsel's failure to object.

As for petitioner's claim that trial counsel should have objected at other times during the trial and sentencing, the Court has determined that there were no constitutional errors or the alleged errors did not prejudice petitioner. The Court therefore declines to grant relief on petitioner's claims concerning the competency of trial counsel.

### F. Appellate Counsel (Habeas Claims Seven and Eight)

24

Petitioner alleges that his appellate attorney was ineffective for not raising all his claims on appeal and was "cause" for his failure to raise all his claims on appeal.

> Failure of appellate counsel to raise an issue on appeal can amount to constitutionally ineffective assistance. *McFarland* [*v. Yukins*, 356 F.3d 688, 710 (6th Cir. 2004)]. Yet, counsel has no obligation to raise every possible claim and "the decision of which among the possible claims to pursue is ordinarily entrusted to counsel's professional judgment." *Id.* An appellate attorney is not required to raise a non-meritorious claim. *See Wilson v. Mitchell*, 498 F.3d 491, 514–515 (6th Cir. 2007).

*Jalowiec v. Bradshaw*, 657 F.3d 293, 321-322 (6th Cir. 2011), *petition for cert. filed*, No. 11-9704 (U.S. Apr. 3, 2012). To prove that his appellate attorney was ineffective, petitioner must show (1) that his attorney was objectively unreasonable in failing to discover and argue all of petitioner's claims on appeal and (2) a reasonable probability that he would have prevailed on appeal but for his attorney's unprofessional errors. *Smith v. Robbins*, 528 U.S. 259, 285-286 (2000).

Appellate counsel raised petitioner's first claim on direct appeal, and for the reasons given above, counsel's failure to raise petitioner's remaining claims was not objectively unreasonable. Nor is there a reasonable probability that petitioner would have prevailed on appeal if his attorney had raised the issues. The Court therefore concludes that appellate counsel was not constitutionally ineffective. Additionally, since the Court has not treated petitioner's claims as procedurally defaulted, there is no reason to consider whether appellate counsel was "cause" for a procedural default.

**IV. Conclusion**

The state courts' determination of petitioner's claims was not contrary to clearly established federal law and did not constitute a unreasonable application of federal law or an unreasonable determination of the facts.

25

Accordingly,

IT IS ORDERED that the petition for a writ of habeas corpus is denied.

IT IS FURTHER ORDERED that the Court shall not issue a certificate of appealability, as reasonable jurists would not debate whether the issues should have been resolved differently or whether they deserve encouragement to proceed further.

IT IS FURTHER ORDERED that petitioner may proceed *in forma pauperis* on appeal because an appeal could be taken in good faith.

S/ Bernard A. Friedman

_____
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated:  October 5, 2012
         Detroit, Michigan

26